The third case on our docket this morning is 23-3084, Carter v. City of Shreveport. Mr. Cameron. Good morning. Nelson Cameron here on behalf of the plaintiff, Jacqueline Carter, ex-friend for William Carter. This case comes before an appeal from the Western District of Louisiana after a grant of a Rule 50 motion after all the evidence in the trial had been given. Judge Hicks dismissed the ADA, Americans with Disabilities Act claims, and the Rehabilitation Act claims of Mr. Carter. And then he also excluded, before that he excluded the plaintiff's expert witness in correctional care, Dr. Joel Nitzke. First I'll address the Rule 50 motion. Judge Hicks had said after hearing all the evidence that was presented in that trial that this was, medical services were provided, it's the inadequacy of those medical services, it's not a denial of an accommodation. We present that the judge was in error for several reasons. First, there was a difference in treatment between disabled and non-disabled prisoners. Mr. Carter was arrested on a misdemeanor 9-1-1 abuse and was taken to the Shreveport City Jail. Admitted there, he was taken directly into what's called a segregation cell because he was in a wheelchair and because he was disabled and paralyzed from the waist down. On October the 12th, two days later, the jail doctor visited Mr. Carter in that segregation cell and prescribed wet to dry dressing change. The only problem with a prisoner being in segregation because he is in a wheelchair is because there's no hands-on examination and there's no bandage change done in segregation. However, non-disabled prisoners are seen in what's called a video conference room. In that video conference room, non-disabled prisoners are provided the opportunity for hands-on examination including a bandage change. Next. Wasn't there some testimony that the only time they assist with bandage changes is if it's an acute or severe injury? And that's both for disabled and those who are not disabled. I don't believe there was any distinguishing between that. It was basically if the prisoner could do it himself, he does it himself. But if he can't do it himself, jailers from time to time would provide assistance in that. And I think some of that might have dealt with the severity of the bandage of the wound or the location of the wound. The next reason we believe Judge Hicks erred in granting the Rule 50 motion is that the plaintiff does not challenge a medical decision. The medical decision was made by the doctor, Dr. Dixon, when he ordered and made clear to jailers that they were to provide dressing assistance with bandage changes. There's a line of cases you see in the Fifth Circuit and other circuits that say if the ADA claim is challenging a medical decision, then it's not actually an ADA claim. It's more of a medical negligence claim or a malpractice claim, something along that line. But that's not what we have here. We do not challenge or say that Dr. Dixon made an incorrect decision when he ordered the jailers to provide assistance with bandage changes. The next reason we believe Judge Hicks erred is because the reason assistance is needed is because of mobility. Mr. Carter paralyzed. He is unable to provide his own bandage change. The wounds that he had, one was on the hip and there were several on the bottom. He would not be able to move his body in a position to be able to change those bandages. Another reason we believe Judge Hicks erred is because there is a relationship, a connection, if you will, between the need for assistance and Mr. Carter's disability. As I said, his mobility challenged. He has paralysis, and the wounds were created or bed sores, and they were created as a result of his disability. Therefore, the failure to provide care for those wounds is a failure to provide care for a disability. And last, the condition that is at issue here is not like the flu or some transitory condition. It is a permanent condition. Now, the standard of review by this court is de novo, and the court must take all inferences and all facts in favor of the non-mover, which is the plaintiff in this case. And there was a case by the Fifth Circuit, Perez v. Doctors Hospital, which made a statement that discrimination, intentional discrimination, is proven by inferences, by inferences. Most of the time, it's by inferences. And that's what we have just described here, which is segregation with a doctor's order and the relationship of those wounds to the disability. Now, the elements that a plaintiff must prove, one, that he's a qualified individual with a disability, which is no question here, Mr. Carter being paralyzed from the waist down and in a wheelchair, was disabled. Next, they have to prove that there's been an exclusion from participation or a denial of the benefits of a program, activity, or service provided by a public entity or otherwise discriminated against. And lastly, he has to prove that the exclusion or denial of benefits was a result of discrimination. And these factors that we have looked at here so far find in favor of the plaintiff on that issue. A review- Are you arguing that your client's placement in a segregated cell was itself discrimination or disparate treatment? It resulted in discrimination, yes, as a result of him being placed in segregation. He was placed in segregation strictly because of his disability. But you agree- I thought you agreed in your brief that the decision to place him there was to protect him from other- I think what your brief called general population miscreants. Yes, that was a reason given. I said it was a stereotypical reason, that it was a reason without foundation. That's what I said in my brief. That's what I meant to say. If I misled you in that way, I apologize. But I believe that placing him in that cell, that segregation cell, resulted in discrimination in the provision of the services that were there at the time. Is it your view that different is always discrimination? Not necessarily. So here, help me understand. Why is different treatment discrimination when it's designed to protect your client? As a result, as Dr. Dixon said, I asked him, why couldn't you see Mr. Carter in the video conference room? He said, I guess that's possible. But because- But he was able to diagnose the problem even outside the video conference room. This is true. He was able to diagnose that wound care was necessary. That's true. But he wasn't able to implement the order of assistance with him being in the segregation. Because he's there, the doctor's outside the bars and the prisoner's inside the bars, so there's no hands-on treatment. I think you can see- But I think the policy, though, they don't do bandage changes for any prisoner, disabled or not. Is that correct? No, that's not necessarily correct. It's kind of a decision that is left up to the discretion of the jailer, apparently. There are times that jailers do provide dressing change or bandage change for some prisoners but not for others. It was kind of an arbitrary type of situation. It was left up to the discretion of that jailer. You can see a couple- My understanding of the record is that there was testimony that the doctor only performs dressing changes sometimes, specifically if the wound is new or acute but that we have chronic injuries here. Right. He does sometimes provide dressing changes in the video conference room and in the general population. The general population, that's where you have non-disabled prisoners there. If it is acute or new, though, that's the part that I'm- I think he does that- I'm not familiar with whether they're acute or not, but that he does provide dressing changes on occasion in the general population and in the video conference room, whether acute or not. Apparently, and there's no doubt that Mr. Carter's wounds and the wounds that he had were acute, but they ended up becoming infected. He discovered that when he left, they were infected. His mother just saw that they were infected. Dr. Abraham saw that they were infected, and by November 2nd, a couple weeks later, he was admitted to Willis-Knighton Medical Center because of an infection of his wounds. Well, a couple of things we see when we look at the Fifth Circuit cases and some of the cases outside the circuit, you'll see a couple of things that happen pretty regularly. The Fifth Circuit says you do not have an ADA claim if your ADA claim is exactly- based on the exact same facts as your Section 1983 deliberate indifference to medical needs case. Here we have at least two different facts. We have the segregation issue and the video conference room issue, and we have also the order, a medical order by Dr. Dixon that is not a part of the ADA case. This is not a case where we're challenging that order or saying that order was negligent in some fashion. And also- I had a question about that. Yes. I understand. Your position is the doctor told the jailers that he needed help with changing the bandages. Yes. Is there evidence that they always did that when the doctor told them to do it with the regular general population, but that because of his disability they didn't change the bandage here? I don't believe there's any evidence of a general practice that any time the doctor says provide assistance, that the jailers do that for non-disabled or disabled individuals. So we're looking to focus strictly on the facts of this case. So here we have a difference in treatment regarding the segregation. We have the doctor's order. Now, because of time constraints, I must go to the expert witness, but the review is by abuse of discretion. Judge Hicks indicated Dr. Nixon was not qualified and not reliable. He was very qualified in that he's been licensed as a medical doctor since 1967. He's been board certified in preventive medicine since 1974. He's past president of national organizations dealing with public health and a past president of a national city and county health officials organization. He's been the state health director for the state of Louisiana, where he provided and made new policies for the state of Louisiana state prison system. And in New York and Florida, he developed medical policies for the county jails that became the foundation for the National Correctional Commission health credentials. So he's had a large amount of experience in public health and in policies in jails. That was the main reason we had this expert, was to come in and look and see what was going on inside the jail that led to the problems that Mr. Carter encountered. He also, as a consequence, said that Mr. Carter's condition deteriorated while he was in jail, and that was probably the main reason why he was not permitted to testify. But he still had other opinions that he could give, very important opinions about state standards being violated, that the doctor wasn't providing standing orders, and that Mr. Carter was not released from jail timely after it was known that the jail could not provide the assistance that he needed. Also, he reviewed all the jailer depositions. He reviewed the policies. He had a very good and substantial foundation upon which to give those opinions. Thank you. Do you have any questions? Good morning. May it please the Court. I'm Nicole Buckle on behalf of the city of Shreveport and its employees. The district court did grant the Rule 50 motion at the close of all the evidence, the way the trial occurred and the presentation of the defense actually occurred, in part, in plaintiff's case in chief. So the district court had the ability to consider all of the evidence at the time it made its decision. This court, we acknowledge that you must view the evidence in the light favorable to the plaintiff. However, you must also consider all evidence that was presented by the movement that is not contradicted. In this case, I think that's important because there's been a lot of argument made on behalf of Mr. Carter, but it's not evidence, and some of the arguments that are being made are not supported by the evidence in the record. I also want to point out that this case proceeded to trial on two issues with respect to the ADA RA claim, and that was the district court, after it denied summary judgment, allowed the case to move forward on whether Mr. Carter was denied frequent repositioning or whether he was denied bandage changing. The issue of whether there was a discrimination based on being placed in a segregated cell arose for the first time on this appeal. That was not an issue that was raised in the complaint. It was not an issue that was raised before the trial. That argument for the first time is being made on appeal, and we don't think it is proper. We do believe that the district court absolutely was correct in its decision that the plaintiff did not have a separate ADA claim, that the facts and the evidence as presented were identical to the Section 1983 deliberate indifference failure to provide medical care claim. In this case, there are no facts that were presented by the plaintiff at trial. There was no evidence that was presented by the plaintiff at trial that would be separate for an ADA claim or separate from the 1983 claim. All of the facts, all of the evidence are identical. Plaintiff's allegations that he was denied bandage changes are the exact allegations that were made in support of the 1983 claim, which the jury found were not supported. I think it's in this court in Epley v. Gonzalez, which was a 2021 case. In that case, I think it's an important comparison because the plaintiff in that case was requesting housing and transportation accommodations. And this court recognized that neither of those two accommodations treat the underlying medical conditions which require their existence. In this case, the bandage changes, the wound care, it does treat the underlying condition. And so that is an accommodation for medical care. It's just a restatement of the failure to provide medical care claim. We've cited numerous cases in our brief where this court and other courts have held that an ADA claim cannot be a mere restatement of the failure to provide medical care claim. It can't be simply a medical negligence. If you look at the evidence, it was argued that there was a medical order by Dr. Dixon for jailers to change the bandages. That's simply not the evidence. Mr. Carter was arrested on October 10th, and jailers were unable to even complete his booking until the 12th because he refused to answer any questions. Jailers on their own placed Mr. Carter on the list to see the doctor, and Dr. Dixon saw Mr. Carter on October 12th for the first time. Dr. Dixon's testimony is that he has no recollection of the October 12th visit. He has no recollection of any statements that he made to Jailer Tobin. He has no recollection of any discussions with Mr. Carter. So there could be no testimony that he gave orders to jailers on that time because he doesn't recall it. The order that the plaintiff is referring to for wet-to-dry dressing was an order for supplies for jailers to provide to Mr. Carter. It was not an order for them to perform the bandage changing. Dr. Dixon acknowledges that jailers are not trained in wet-to-dry bandage changing, that he's not aware that they do that, or that he acknowledges that that's not a service that they provide. Judge Douglas, you asked if there was a difference between whether wound care was provided for acute wounds or something chronic, and that was the testimony. There was some testimony that jailers may help provide a Band-Aid, and Dr. Dixon testified that he was aware that jailers might provide tape to an inmate, but he knew that they don't actually perform a dressing change. And there certainly, there was no evidence at all, no testimony, that anyone performed the type of dressing for a Stage 4 pressure ulcer that was a chronic condition like Mr. Carter had. There's just simply no evidence that that was done, and frankly, if the jailers had done that, we would be here for another issue because they weren't trained, and they would have been providing medical care that they weren't qualified to provide. Does the type of examination that Carter received, through the bars versus in a separate room, does it matter for the claims? I don't believe based on the facts of this case, Your Honor, and that's because Mr. Carter wasn't complaining of his bed sores. He wasn't complaining of any pain. He wasn't requesting assistance at any time. So if we look at the information that Dr. Dixon and the jailers had when this examination was done, it was simply that he had bed sores. And as Dr. Dixon testified, bed sores are very common. People are at home with them very often and are able to treat them on their own in a home setting. And so, certainly if this was a situation where there was evidence that Mr. Carter specifically requested an examination, perhaps that might be different, but that's not the evidence. In fact, Mr. Carter testified that he did not request any assistance and didn't complain of that to Dr. Dixon on that day. So that also goes back to the element of whether, in order to prove the failure to accommodate claim, the plaintiff has to show that the city knew of the disability, but also knew of the consequential limitations. In that case, that would be that the jailers knew that he was not capable of providing the type of wet-to-dry dressing change that was an issue. The only time that that was presented to the jailers, or that anyone with the city had that knowledge, came on October 17th after Dr. Dixon did the second examination. And he specifically told jailers, or he told Jailer Jones, that Mr. Carter needed more assistance than the jail could provide. But what's important in there, Dr. Dixon did not perform any type of bandage change. He didn't instruct jailers to perform any type of bandage change. And he did not instruct that he perform, excuse me, he did not instruct that jailers transport him to the hospital. He didn't believe that Mr. Carter needed to be transported to the hospital. He was simply advising that he needed more care than the jail could provide, which is a recognition that the jail does not provide those services. And then Jailer Jones contacted the city court, and Mr. Carter was released the following day. So, I mean, in this case, Mr. Carter is arguing that he wasn't transported to the hospital. But the fact is, he was actually treated more favorably than other inmates because of his disability, because he was released. Had he not had the disability, he would most likely have been in the Shreveport City Jail for a lot longer period of time. We cited Bryant v. Madigan, which is a Seventh Circuit case, although this court has relied on it several times when discussing ADA claims. And I think this goes back to the fact that the plaintiff's claims are identical to his Section 1983 failure to provide medical care claims. And in Bryant, the Seventh Circuit recognized that the ADA was not intended to create a medical malpractice cause of action for disabled prisoners. The ADA was designed to prohibit discrimination and to make sure that disabled inmates are on an equal playing field, that they're not denied any type of rights. The intent was not to provide them additional rights. And I think if this court reverses the district court's decision in this case, that's exactly what you'll be doing, is by allowing an additional cause of action for disabled inmates that otherwise would not exist for non-disabled inmates. All of the facts, all of the evidence are identical to the failure to provide medical care claim, which the plaintiff was able to proceed to trial and have a jury decide. We do not believe that the ADA was intended to allow the plaintiff to have a second bite at the apple with a separate cause of action. That's not what the ADA was designed to do. Are there any further questions with respect to that claim or that issue? The second issue which was raised by the plaintiff was the court's denial of Dr. Joel Nitsken as an expert witness. In this context, the plaintiff has not appealed the judgment of the court. They're simply asking that in the event this court reverses the district court's decision on the Rule 50 motion, that Dr. Nitsken be allowed to testify as to the ADA claim if it's remanded. In reviewing the plaintiff's, both the original brief and reply brief and then on argument, there are no opinions that Dr. Nitsken purported to provide that relate to the ADA claim. All of his claims were based on causation, which Dr. Nitsken, and we've cited that in our brief, admitted he's not a wound care expert. He might have, and there's no dispute that he certainly has general practice expertise, and he has been a physician for a long time, but his own testimony was that he is not an expert in wound care. Those were his own words. He stated that the last time he personally treated a patient for wound care was in 1966 or 67, when he was doing his internship, and all of his knowledge was just in general practice. The type of causation we have at issue is not something that a general practice physician should be able to opine on. These are stage four pressure ulcers that we're talking about, infection of the bone, whether it leads to sepsis, and certainly there are specialists that deal with this on a day-to-day basis, and so by his own admission that he was not qualified to opine on wound care, he certainly would not be able to opine on the causation from a lack of wound care. With respect to Dr. Nitsken's statements on policies, we don't believe that those are relevant to the ADA claim that's been presented or that's been argued. The Monell claim was dismissed on summary judgment, so any opinions on policies and procedures were no longer relevant, and we don't believe that the plaintiff has shown how any of those opinions would be appropriate for the ADA claim if this was remanded. So if there are no further questions, we would ask that all rulings at the district court be affirmed, and I will tender my time to the court. First, I would like to point out that I did bring the point about segregation, the segregation cell to the court's attention at the Rule 50 motion that's on tab 5 on page, I believe it's eight page numbers are coming up, the record on appeal 4307. The court said you make a proffer after hours on that issue, but this doesn't match up case laws against you. So this is a little bit different. This is about where he is examined at by the doctor at the jail. He's examined in segregation, and he's a disabled person because he's in segregation. He's in segregation because he's disabled. All the non-disabled people were in a private room in the video conference or the arraignment room. That's the place where a doctor could have examined his wounds. He couldn't examine. He doesn't, and the court interrupts. It's still denied. You may make your proffer. I don't want to hear anything else on it. So we did present it to the judge and allowed him the opportunity to examine that issue. It was not accepted. I'm sorry. Rule 50, this was after you had rested your case? This was after the case had been rested, the chief had rested? Yes. All the evidence had been presented. Is that what you're referring to? Yes. Okay. All the evidence had been presented. Rule 50 motion was made. The judge allowed the deliberate indifference for medical needs to go to the jury. Also, looking at whether Mr. Carter or whether Dr. Dixon on October the 12th had any meeting with Mr. Carter, record on appeal, page 40, 13, line 14, 003, line 13, 4000, line 5, indicates, in fact, he did talk to him. Now, as far as what cross-examination was able to bring out, that's something that a fact finder would have to decide on. And if you're taking all the facts in favor of the plaintiff, it is absolutely correct that Dr. Dixon went to Mr. Carter's cell, segregation cell, on October the 12th and ordered the bandage changes and told them, told the jailers, in no uncertain terms, that he needed assistance. He said he did that on October the 17th, did that on October the 12th. The defendants are trying to say that, well, we just ordered some gauze. That's all that is, is just an order for gauze. But for what purpose? The purpose is to change. And it was obvious to the jailers that a man who is paralyzed from the waist down is going to need some assistance in applying those bandages on his bottom. He didn't speak. It's a little bit like the Delano Pike case where the deputy is doing the filter body test on the hearing-impaired individual. The hearing-impaired individual didn't ask for some alternative means of the deputy to communicate with him because it was obvious to the deputy that he needed help, but the deputy didn't provide it. Same principle. And an important point is on October the 17th in the morning, Mr. Carter, or Dr. Dixon says, the jail cannot provide the assistance that Mr. Carter needs. And it wasn't until that next afternoon that Mr. Carter was finally released. Dr. Dixon admitted that these bandage changes needed to happen on a daily basis. He didn't get the bandage changes on October 17th or October the 18th. It wasn't until he got home with his mother that he got a bandage change. Going to the expert, the only opinion that Dr. Nitzkan had was there was interim deterioration. He didn't say there was infection. Deterioration, there's different ways a wound can deteriorate. There's no opinion about the intricacies of wound care because there wasn't everything in wound care provided. So we wouldn't need opinions on how you do a wet-to-dry dressing change or anything such as that. And he was familiar with infection. He had that experience with public health. And the standing orders, he said, weren't any. And that's one reason why he didn't get the help that he needed. Thank you. Any other questions? Thank you. That will conclude the panel's arguments today. The cases we've heard since Monday are under submission.